12-2873-cr
United States v. Mergen

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: September 12, 2013     Decided: August 21, 2014)

Docket No. 12-2873-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

Appellee,

- v.-                          No. 12-2873-cr

VOLKAN MERGEN,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:          KATZMANN, Chief Judge, JACOBS, Circuit Judge, and
DUFFY, District Judge.[*]

---

[*] Judge Kevin Thomas Duffy, of the United States District Court for the
Southern District of New York, sitting by designation.

Volkan Mergen appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Garaufis, J.).

We reject Mergen's sufficiency-of-evidence challenge to his Travel Act conviction, but nevertheless vacate that conviction because the district court erred by excluding, on hearsay and authentication grounds, a recording in which an FBI agent assured Mergen that he had done nothing wrong in connection with the underlying arson. As to Mergen's remaining convictions (for drug distribution, attempted robbery, firearm possession, and related conspiracies), we reverse because the wording of Mergen's cooperation agreement did not toll the (expired) statute of limitations for those offenses.

> ANDREW J. FRISCH (Jeremy B. Sporn, on the brief), The Law Offices of Andrew J. Frisch, New York, NY, for Defendant-Appellant.
>
> EVAN M. NORRIS (Emily Berger & John J. Dennehy, on the brief), for Loretta E. Lynch, United States Attorney, Eastern District of New York, for Appellee.

DENNIS JACOBS, Circuit Judge:

Volkan Mergen appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Garaufis, J.).

Mergen had been for years a paid FBI informant operating inside mob families. In 2006, he participated with mob members in an arson without giving the FBI a pre-arranged signal that would have allowed the agency to abort the crime. (The government suspected that Mergen feared his status as a paid informant would end if the FBI, forewarned, intervened.) On June 5, 2006, Mergen entered into a cooperation agreement with the United States Attorney's Office, by which he would plead guilty to a Travel Act offense in connection with the arson (he bought gas in New Jersey to avoid surveillance on Staten Island) in exchange for a substantial-assistance letter. One provision of the agreement tolled the statute of limitations for prosecutions resulting from Mergen's breach and "premised upon, among other things," Mergen's statements to the government, or his testimony, or leads derived therefrom. When Mergen breached that agreement by falsely disclaiming knowledge about a theft of three cheap watches, the government demanded that Mergen also plead to making a false statement; Mergen refused; and two superseding indictments were filed, charging him with the Travel Act offense as well as various criminal acts (drug distribution, attempted robbery, firearm possession, and related conspiracies) that the government learned about from persons who had been convicted based on

3

Mergen's cooperation. Mergen was not charged with making any false statement.

Mergen brings this appeal from his conviction on all counts.

We reject Mergen's sufficiency challenge to the Travel Act conviction, but nevertheless vacate that conviction because the district court erred when it excluded, on hearsay and authentication grounds, a recording in which an FBI agent assured Mergen that he had done nothing wrong in connection with the underlying arson. As to Mergen's remaining convictions (for drug distribution, attempted robbery, firearm possession, and related conspiracies), we reverse because the wording of Mergen's cooperation agreement did not toll the (expired) statute of limitations for those offenses.

The facts recited in this opinion are taken from the trial record. Because the jury found Mergen guilty, we view the evidence "in the light most favorable to the government." United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004).

**I**

In May 2001, Mergen contacted FBI Special Agent George Wright and agreed to become a paid FBI informant. Mergen's efforts over the next

4

half-decade included wearing a wire while working with members of the Gambino and Bonanno crime families. Mergen's service was fruitful: he sometimes submitted so many recordings to the FBI that the agency could not keep pace.

In January 2005, Mergen began associating with a crew on Staten Island affiliated with the Bonanno family. The crew was led by Michael Maggio and also included Joseph Young and John Tufarelli. Mergen made hundreds of recordings of their conversations.

The following year, on January 24, 2006, Mergen warned the FBI that the crew was planning an arson that night. FBI Special Agent Anthony Zampogna, Mergen's then-supervisor, told Mergen that he was not authorized to participate in the arson and that the FBI would do whatever was necessary to prevent it--even if it meant ending Mergen's role as an informant. The FBI laid preparations near the target and gave Mergen a code phrase to use if the arson was imminent; he was to call and alert Special Agent Lauren Regucci, who would pose on the phone as Mergen's girlfriend, and tell her: "I'm running late." The arson, however, was postponed when Mergen was able to distract Young. Nor did it happen the next day: Mergen told Agent Zampogna that Young was ill.

5

The arson was eventually committed in the early hours of January 27, 2006. Maggio told Mergen about the plan the prior afternoon; but although Mergen spoke with and met Agent Zampogna later that day, there is no evidence beyond Mergen's own testimony that Mergen took these opportunities to warn the FBI. Mergen did, however, record the conversations leading up to the arson, and later turned over those recordings to the FBI.

Mergen's recordings document the time-line of the arson and were used by the prosecution to demonstrate that Mergen passed up opportunities to give warning. At 9 PM on January 26, Young said "let's go to my house . . . , pick up the gas cans in my garage, go take care of this kid." See App. 108-09; Gov't App. 118. Over the next six hours, Mergen, Young, and Maggio planned and executed the operation. Mergen, in the presence of Young and Maggio, phoned several girlfriends, but did not call Agent Regucci to deliver the coded warning. Around 1 AM, Mergen, Young, and Maggio went to Young's home to pick up a propane bomb and gas canisters. Mergen suggested that they get gasoline from New Jersey, a useful precaution (he explained to the others) because, after the arson, law enforcement would review camera tapes from gas stations in Staten Island. The three drove to New Jersey, bought gasoline, and then returned to Staten

6

Island to eat. At the diner, Mergen saw police officers enter, but did not alert

them. At about 2 AM, Mergen told (another) girlfriend that he would be busy

for the next half hour or so. Shortly before 3 AM, the crew went to the target

house in separate cars. Mergen, who drove Young, parked near the target;

Young ran out, firebombed the house, and ran back; all three drove away.

Minutes after the house was set afire, Young left Mergen's car. At that juncture,

Mergen called Agent Zampogna and told him that "[t]hey" had committed the

arson.

Agent Zampogna testified that he and Agent Regucci were unaware the

arson would occur and therefore did not prepare. The fire department put out

the fire, but not before the owner of the house suffered cardiac arrest and had to

be revived at the hospital.


## II

After the arson, the United States Attorney's Office approached Mergen

about a possible deal. On June 5, 2006, Mergen signed a cooperation agreement;

he agreed to plead guilty to a Travel Action violation (i.e., the trip to New Jersey

to get gasoline for the arson), in return for a § 5K1.1 "substantial assistance"

sentencing letter. The statutory maximum sentence for a Travel Act offense is five years' imprisonment. See 18 U.S.C. § 1952(a)(3)(A).

That same day, Mergen waived indictment and pled guilty. His plea allocution recited that he "traveled with others by car . . . to obtain gasoline to be used to set fire to a house. . . . In Staten Island, we drove to a house and one of the individuals set fire to the house using the gasoline. At the time of these events, I was cooperating with the government but I did not have authorization to set fire to a house or to obtain gasoline for that purpose." Gov't App. 26.

The deal unraveled when, in a debriefing session months later, Mergen falsely denied knowledge regarding theft of three stolen fake watches worth about $75 in the aggregate. The government told Mergen he now had to plead guilty to an additional charge of false statement; Mergen refused; and the government decided to withhold a § 5K1.1 motion after all.[1] Mergen successfully moved to withdraw his plea, and refused to sign any new agreement without a § 5K1.1 commitment.

---

[1] Interestingly, the government never did pursue any false statement charge. The district court later denied the government's motion to admit evidence at trial concerning the watch theft and Mergen's allegedly false statement about it. See App. 10-11.

8

The standoff continued. Naturally, the government stopped paying Mergen his monthly stipend. Then, on September 24, 2009, the government filed a superseding indictment charging five additional counts: conspiracy to commit robbery, attempted robbery, firearm possession during the attempted robbery, conspiracy to distribute cocaine and marijuana, and actual distribution of cocaine and marijuana. A second (substantively identical) superseding indictment was filed on April 7, 2010.

The government gathered evidence of Mergen's participation in these crimes from the (obliging) targets Mergen had helped convict. At Mergen's trial, Tufarelli (a member of the Maggio crew) testified that he and Mergen began dealing marijuana in Staten Island in about early 2002; and that, after about a year of that business, he convinced Mergen to join him in selling cocaine, an enterprise that lasted until "early 2004 to 2005 maybe." App. 201-03.

Tufarelli and Daryl Rosenblatt (another criminal associate brought down by Mergen) testified that, in August 2002, Mergen plotted to rob a check cashing operation run out of a Staten Island gas station parking lot; that, in preparation, Mergen supplied the other two with firearms, and enlisted as getaway driver; but that the attempt was frustrated when the target became suspicious.

9

Normally, the five-year statute of limitations would have barred prosecutions for offenses occurring before September 24, 2004. See 18 U.S.C. § 3282(a). The government, however, relied on the tolling provision of the cooperation agreement, which, by the government's reading, allowed it to commence any prosecution not time-barred as of the date of the agreement's signing, i.e., June 5, 2006. Mergen moved to dismiss the additional charges as time-barred; the district court agreed with the government's reading and concluded that Mergen had waived the statute of limitations.

At the ensuing trial, the government used Mergen's own recordings and testimony from FBI agents and from cooperating witnesses whom Mergen had ensnared.

Mergen was the sole defense witness. He acknowledged that he was authorized to commit only certain crimes, and needed prior approval for any others; but, he testified, he did warn agents about the arson's timing and the FBI told him that everything was "under control." Given this approval--and his fear of being discovered and killed by Young and Maggio--Mergen "went along with" the crew's plan.

On April 22, 2010, after six days of trial, the jury convicted Mergen on all counts. The district court entered judgment on July 5, 2012 and sentenced Mergen to 12 years' imprisonment.

## III

Mergen argues that his Travel Act conviction should be reversed because (A) there was insufficient evidence that he possessed the requisite intent; and (B) his conduct was justified by the public authority and related defenses. We reject these arguments.

## A

The Travel Act punishes with imprisonment of not more than five years (and a fine) those who "travel[] in interstate . . . commerce . . . with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a). Mergen argues that there was insufficient evidence for a jury to find beyond a reasonable doubt that he had the requisite intent to facilitate the arson.

"We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences

11

that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). A defendant "bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002) (citations and internal quotation marks omitted).

That burden is decisive here. It is certainly odd that Mergen would intend to facilitate an arson that he had himself brought to the government's attention and had warned the government about days earlier, and that he was contemporaneously recording for the FBI. We cannot say, however, that no rational jury could find that the government established the essential elements of the Travel Act crime beyond a reasonable doubt.

The evidence at trial credited by the jury established that Mergen was an active participant in the arson. Mergen failed to warn the FBI despite numerous opportunities to do so. He had meetings with agents earlier that day, and ample time to relay a secret code while the plot was progressing. Moreover, he repeatedly spoke to his girlfriends on the phone, and the jury was free to conclude that the only reason he did not deliver the coded warning to Agent Regucci (posing as yet another girlfriend) was his intent to facilitate the arson.

12

We are not unsympathetic to Mergen's argument that he was in fear of Young and Maggio, who are indisputably violent criminals. (Maggio, for example, suggested that Young shoot anybody who ran from the burning building.) Mergen testified to earlier occasions on which the FBI had stood aside after he warned them that the crew might engage in crimes of violence, such as an October 2005 episode in which a victim was beaten and threatened while the FBI was conducting surveillance.

The jury, however, was privileged to discount or reject Mergen's testimony, and obviously did. We therefore reject the invitation to reverse the Travel Act conviction.

**B**

We also conclude that Mergen cannot rely on the public authority defense, which "exists where a defendant has *in fact* been authorized by the government to engage in what would otherwise be illegal activity." United States v. Giffen, 473 F.3d 30, 39 (2d Cir. 2006) (emphasis added). Mergen concedes that he "plainly was not expressly authorized to participate in an arson." Appellant's Br. at 34.

13

Nor has Mergen made out a "defense of entrapment by estoppel," which requires that "the government, by its own actions, induce[] [the defendant] to do [criminal] acts and le[a]d him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization." Id. at 41. "[G]reat caution should be exercised when it comes to the application of the defense," United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994); "the defendant's conduct must remain within the general scope of the solicitation or assurance of authorization" and the "defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization," United States v. Abcasis, 45 F.3d 39, 43-44 (2d Cir. 1995). Beyond his own testimony (which the jury did not credit), Mergen adduced no evidence of government action that would have created a reasonable belief that his participation in the arson was implicitly authorized.

Finally, Mergen raises the so-called "negation of intent" doctrine, a doctrine we have not previously recognized, by which a defendant undertakes to "rebut the government's proof of the intent element of a crime by showing that the defendant had a good-faith belief that he was acting with government authorization." Giffen, 473 F.3d at 43. Even if we were to recognize the doctrine,

14

it is unclear what independent role it would play; Mergen already argues that he lacked the requisite intent for a Travel Act violation because of his informant status. We therefore reject this argument for the reasons stated <u>supra</u>.

**IV**

Mergen argues that the district court erred by excluding a recorded conversation between Mergen and Agent Wright, who was Mergen's handler.[2] In the recording, which Mergen made surreptitiously soon after the arson, Agent Wright assured Mergen he had not done "anything wrong" the night of the arson.

At trial, the prosecution asked Agent Wright if, "based on [Agent Wright's] conversations with [Mergen] about [Mergen's] conduct on the night of the arson," Agent Wright "form[ed] a view as to whether [Mergen] should be criminally prosecuted for what he had done." App. 249. Over Mergen's objections, Agent Wright testified that he had taken the view that "Mergen should be criminally prosecuted." <u>Id.</u>

---

[2] Though Agent Zampogna was Mergen's direct supervisor at the time of the arson, Agent Wright had worked closely with Mergen in the preceding years and continued to "maintain[] contact" and to formally serve as Mergen's "handling agent." <u>See</u> App. 248, 262.

15

On cross-examination, Agent Wright reaffirmed that he "felt that [Mergen] was criminally responsible, involved with the arson." App. 263. Mergen then asked, "[D]id you ever tell [Mergen] that you felt he did nothing wrong?" Agent Wright responded, "No, I did not." Id. Mergen sought to impeach by playing the recorded conversation. The district court ruled that Mergen could not play the recording to the jury; Mergen was able only to ask Agent Wright again if he "ever t[old] Mr. Mergen on . . . any occasion that with regards to the arson, he did nothing wrong"--to which Agent Wright again responded, "No." App. 266. When Mergen later took the stand in his own defense, he again sought to play the recording to the jury; but the district court upheld the government's objection, on grounds of hearsay and lack of authentication. See App. 297 ("It is hearsay. And furthermore, there is no way of authenticating that tape.").

A prior summary order issued in this case, United States v. Mergen, 543 F. App'x 46 (2d Cir. 2013), remanded for the district court to clear up some lingering evidentiary confusion (the record on appeal included multiple recordings), and to confirm that the recording Mergen sought to introduce at trial included the following:

Mergen: Between you and me, do you think I did anything wrong that night [of the arson]?

Agent Wright: No, no.

After a hearing on May 2, 2014, the parties agreed that the recording Mergen sought to play at trial *did* include this exchange. Because of the district court's evidentiary rulings, however, the jury never heard it, and only had before it Agent Wright's testimony regarding his consistent view that Mergen was criminally responsible.

As we explained in our earlier summary order, the recording "should not have been excluded on the bases of either hearsay or lack of authentication." Id. at 49. That is because (1) "prior inconsistent statements offered for impeachment are, by definition, not hearsay"[3]; and (2) "the fact that some portions of a recording may be inaudible is not a proper basis for exclusion under the authentication rule."[4] Id.

---

[3] Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2); see also United States v. Reyes, 18 F.3d 65, 69 (2d Cir. 1994). Prior inconsistent statements are not offered for their truth, but rather to demonstrate the witness's lack of credibility. See Farrington v. Senkowski, 214 F.3d 237, 241 n.1 (2d Cir.2000).

[4] "Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy[,] the recording is admissible." United

17

Notwithstanding Mergen's role as an informant, the evidence on the Travel Act count was (as we conclude) sufficient because Mergen's role was ambiguous. Looked at one way, Mergen was traveling to advance an arson by racketeers and keeping the FBI in the dark to preserve his informant role (and meal ticket). Looked at another way, he was doing his best to stay alive in dangerous company on a dangerous mission. The prosecution's theory was that Mergen went rogue and violated the unambiguous orders of his FBI handlers-- among them, Agent Wright.

The jury heard only Agent Wright's testimony (originally solicited by the prosecution) that Agent Wright was of the consistent view that Mergen was criminally culpable; impeachment evidence that would have subverted that view was withheld from the factfinder. "In a case . . . that depends on whether the jury believes the word of the defendant versus the word of an FBI agent, exclusion of such impeachment evidence is not harmless error." Mergen, 543 F. App'x at 49.

---

States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973); see also United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977). "Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." United States v. Arango–Correa, 851 F.2d 54, 58 (2d Cir. 1988).

Accordingly, we vacate Mergen's Travel Act conviction, and remand to the district court for a new trial on this count.

**V**

Mergen argues that the statute of limitations barred the prosecutions for the other offenses: attempted robbery of the check cashing operation, firearm possession during that attempted robbery, drug distribution, and related conspiracies. Specifically, he contends that (A) withdrawal of his guilty plea rendered the cooperation agreement a nullity; (B) his waiver was invalid because the court did not sufficiently warn him of the consequences; and (C) the limitations waiver in the cooperation agreement does not apply to these offenses. We reject the first two contentions, but agree with Mergen that the government's expansive reading of the cooperation agreement cannot be sustained. We therefore reverse the remaining convictions.

**A**

Mergen first argues that withdrawal of his guilty plea effected rescission of the cooperation agreement. Not so: "rescission is intended to be a remedy for the injured party, i.e., the defrauded party or the party injured by a breach of a

19

contract." United States v. Gregory, 245 F.3d 160, 166 (2d Cir. 2001). Mergen "was not the injured party; instead, he breached the agreement." Id. The government has not sought rescission, and Mergen is therefore bound by the agreement.

**B**

Mergen next argues that any waiver was invalid because the magistrate judge did not specifically address Mergen's waiver of the statute of limitations defense on the record. But there is no requirement that the court advise a defendant about giving up a statute of limitations defense: no such requirement is enumerated in Federal Rule of Criminal Procedure 11(b)(1), nor is waiver a "direct consequence[] of a guilty plea, such as the maximum prison term, the maximum fine, and the effect of possible supervised release." Zhang v. United States, 506 F.3d 162, 167 (2d Cir. 2007).

**C**

Finally, Mergen argues that the tolling provision of the cooperation agreement did not apply to the drug, robbery, firearm, and conspiracy offenses. We agree.

20

Paragraph 9 of the cooperation agreement, on which the government

wholly relies, states:

> Any prosecution resulting from the defendant's failure to comply
> with the terms of this agreement *may be premised upon, among other
> things*: (a) any statements made by the defendant to the Office or to
> other law enforcement agents on or after January 26, 2005; (b) any
> testimony given by him before any grand jury or other tribunal,
> whether before or after the date this agreement is signed by the
> defendant; and (c) any leads derived from such statements or
> testimony. *Prosecutions that are not time-barred by the applicable
> statutes of limitation on the date this agreement is signed may be
> commenced against the defendant in accordance with this paragraph,
> notwithstanding the expiration of the statutes of limitation between the
> signing of this agreement and the commencement of any such prosecutions.*
> . . . .

App. 26-27 (emphases added).

Without the tolling provision of Paragraph 9, the five-year statute of

limitations would indisputably have barred prosecution for conduct occurring

before September 24, 2004, that is, all of the conduct at issue.[5]  Paragraph 9

---

[5] Tufarelli testified that the narcotics distribution may have continued into
2005.  Tufarelli's testimony, however, consisted of equivocal answers to questions
by which the prosecution invited vague responses:

> [Prosecutor:] Can you tell the jury about how long the two of you
> were in the cocaine business together?
> [Tufarelli:] Anywhere between, like, I know it was at least up to, like,
> maybe 2000, early 2004 to 2005 maybe.  I'm not exactly sure of dates,
> but it was into the Coke business. . . .

21

provides that "[a]ny prosecution resulting from [Mergen's] failure to comply with the terms of this agreement may be premised upon, among other things," three categories: (1) statements made by Mergen to the government; (2) Mergen's testimony; and (3) "leads derived from such statements or testimony." Paragraph 9 goes on to provide that the statute of limitations is tolled only "in accordance with" that paragraph.

The government reads "among other things" to include evidence derived from the very criminals Mergen helped to catch and convict. If the agreement is read expansively, this interpretation would certainly be arguable. But it is quite settled that "courts construe plea agreements strictly against the Government. This is done for a variety of reasons, including the fact that the Government is

---

> [Prosecutor:] Now, you testified that you and the defendant were in the cocaine business in some manner till approximately 2004 and 2005; is that correct?
> [Tufarelli:] Yes.
>
> [Prosecutor:] Did you and the defendant ever do any cocaine transactions after that?
> [Tufarelli:] No.

App. 202; Gov't App. 56. From testimony that Mergen did no cocaine transactions "after that," i.e., after "approximately 2004 and 2005," no reasonable jury could find beyond a reasonable doubt that Mergen was involved in drug distribution *after September 24, 2004.*

usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power." United States v. Ready, 82 F.3d 551, 559 (2d Cir. 1996), superseded on other grounds as stated in United States v. Cook, 722 F.3d 477, 481 (2d Cir. 2013); accord United States v. Cimino, 381 F.3d 124, 127 (2d Cir. 2004); United States v. Aleman, 286 F.3d 86, 90 (2d Cir. 2002). "Even if the plea agreement is ambiguous, we construe plea agreements strictly against the Government." United States v. Carmichael, 216 F.3d 224, 228 (2d Cir. 2000) (internal quotation marks omitted).

Resolving ambiguities in favor of Mergen, we cannot conclude that the statute of limitations was tolled for offenses that the government learned about from persons Mergen helped convict. These offenses are not based upon statements made by Mergen to the government on or after January 26, 2005 or any testimony he gave; and the leads were derived from neither source.

The government relies on the phrase "among other things"; but the listed categories of things upon which tolled prosecutions may be premised are wholly distinct from the sources on which these prosecutions were based. See Can. Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG, 335 F.3d 52, 58 (2d Cir. 2003) ("Usually, . . . general language in an enumeration of specific

23

illustrations is construed in a fashion that limits the general language to the same class of matters as the things illustrated.").  The term might encompass, for instance, physical evidence obtained as a result of Mergen's cooperation. (Physical evidence is neither a statement nor testimony, and may not constitute a lead derived therefrom.)  There may be some play in the joints, but "among other things" implies other things of a similar kind and nature.

The government can prevail on this issue if Paragraph 9 is construed to contain no limiting principle, so that Mergen's breach would allow any prosecution notwithstanding any otherwise applicable statute of limitations.  But if the government wished to clearly reserve the latitude it has asserted, it need not have troubled to draft detailed contractual verbiage; simple wording would have allowed these prosecutions: "In the event Mergen violates this agreement, the statute of limitations is tolled as of today for any offense he has committed."[6] The government drafted the convoluted and ambiguous tolling provision in Mergen's cooperation agreement, and such ambiguity must be resolved in favor of Mergen.

---

[6] The government points out that a different paragraph, Paragraph 8, provides that "[t]he defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge" if Mergen breaches the agreement. App. 25-26.  Paragraph 8, however, says nothing about the statute of limitations and is not referenced in Paragraph 9.

**CONCLUSION**

For the foregoing reasons, we (1) vacate Mergen's Travel Act conviction; (2) reverse the remaining convictions; and (3) remand for retrial on the Travel Act count and dismissal of the rest of the indictment.[7]

---

[7] The government's August 4, 2014 motion for clarification is therefore denied as moot.